UNITED STATES of America ex rel. Thomas William **ROBINSON**, Petitioner,

v.

Melvin **LAIRD**, et al., Respondents.

No. 71–1428.

United States Court of Appeals, Seventh Circuit.

March 24, 1972.

**742**

Michael E. Povich, Cook County Legal Assistance Foundation, Inc., Harvey, Ill., for petitioner; Patrick A. Keenan, Cook County Legal Assistance Foundation, Inc., Brookfield, Ill., of counsel.

James R. Thompson, U. S. Atty., Roger H. Dusberger, Asst. U. S. Atty., William J. Bauer, U. S. Atty., Chicago, Ill., for respondents; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel.

Before SWYGERT, Chief Judge, and KILEY and SPRECHER, Circuit Judges.

SWYGERT, Chief Judge.

This is an appeal from the district court's dismissal of a petition for a writ of habeas corpus. Petitioner Seaman Thomas William Robinson filed the petition in the district court challenging the validity of the United States Navy's denial of his application for discharge as a conscientious objector. The district court affirmed that denial, holding that the Navy had a "basis in fact" for rejecting the petitioner's application. We do not agree with that holding.

Robinson enlisted in the Navy on July 1, 1968, serving first as a student and then as a staff member at the Basic Electricity/Electronics School of the Naval Training Center at Great Lakes, Illinois. On September 9, 1970, pursuant to Bureau of Naval Personnel Manual § 1860120 and Department of Defense Directive No. 1300.6,[1] he submitted a request for discharge on the grounds of conscientious objection. He stated:

> Few of us honestly wish to be involved in war, it is opposed to the religious and idealistic doctrines we have set up for ourselves. War propagates

---

1. Selective Service Act of 1967, 50 U.S.C. App. § 456(j), *formerly* ch. 625, § 6(j), 62 Stat. 612 (1948) exempts from "combatant training and service" any registrant

   who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term religious "training and belief" does not in-

   clude essentially political, sociological, or philosophical views, or a merely personal moral code.

   Department of Defense Directive No. 1300.6 (dated May 10, 1968) requires that legitimate in-service claims to conscientious objector status be honored by the various branches of the armed forces. Bureau of Naval Personnel Manual § 1860120 implements these requirements.

little of value, and certainly may lead to our ultimate destruction. In short, few men would preach the benefits of war.

As an American I am responsible to function against those who would promote war, especially for reasons of an immoral nature. For war is and has been the bane of mankind; kindled by a minority who thwart reality in turn allowing the existence of this conflict to be perpetuated.

\*     \*     \*     \*     \*

I do intend my claim as a conscientious objector to be considered not only on a moral basis, but also in a religious context. For there is a superior power as yet, I cannot, nor wish to define its nature. It has made its desires evident; this power has given us a code with which to live. Our responsibility is to follow this code.

His application was accompanied by the letters of five friends and relatives, the account of a Navy psychiatrist stating that his beliefs appeared to be "deeply rooted," a letter from a Navy chaplain reporting that he believed the plaintiff to be "religiously inclined," and a letter written by his immediate superior officer which contended that he was "very sincere" and recommended that his request for discharge be approved. On December 16, 1970, Robinson's application was denied by the Bureau of Naval Personnel on two grounds: The Bureau stated first that ". . . it is clear that your objections spring from logical and philosophical objection to the present war." Secondly, it found that "while it appears that you are sincere in your beliefs, it is equally clear that they are essentially philosophical and not the deeply held moral, ethical or religious beliefs required for qualifications as a conscientious objector."

The standard for judicial review of the Bureau's determination is a strict one. Our inquiry may focus only on the information before the Bureau of Naval Personnel at the time it was considering petitioner's application. United States ex rel. Kellogg v. McBee, 452 F. 2d 134 (7th Cir., 1971). Under Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946), review is limited to a determination of whether there was a "basis in fact" for the Bureau's characterization. See United States ex rel. Trainin v. Cain, 144 F.2d 944 (2d Cir. 1944). We find no factual support for the Bureau's conclusions in the case before us. Moreover, the justifications of the Bureau's findings advanced by the Government on appeal are at best tortured. Interpretation of belief is a complex task. The Government cannot glean a "basis in fact" from sentences taken out of context, or an in-depth content analysis of Robinson's application which singularly distorts the plain meaning of his words. It cannot suggest that this kind of analysis offers a reasonable basis for disregarding the testimony of a Navy psychiatrist, a Navy chaplain, and Robinson's immediate superior officer.

We find that Robinson's beliefs clearly qualify as "religious" under the test of United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), and Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970). Both *Seeger* and *Welsh* concerned plaintiffs who were admitted to be sincere but whose claims could not be characterized as "religious" under traditional religious standards. *Seeger* extended the definition of "religious" to include those for whom the claimed belief "occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption. . . ." 380 U.S. at 176, 85 S.Ct. at 859. In *Welsh*, the registrant's beliefs were claimed by the Government to be even more unorthodox. As in the instant case, the Government sought to distinguish *Seeger* on the grounds that Welsh's views, unlike those of Seeger, were "essentially political, sociological or philosophical views or a merely personal

moral code." The Court rejected this argument:

> We certainly do not think that § 6(j)'s [50 U.S.C. App. § 456(j)] exclusion of those persons with "essentially political, sociological, or philosophical views or a merely personal moral code" should be read to exclude those who hold strong beliefs about our domestic and foreign affairs or even those whose conscientious objection to participation in all wars is founded to a substantial extent upon consideration of public policy. . . . [I]t should be remembered that these exclusions are definitional and do not therefore restrict the category of persons who are conscientious objectors by "religious training and belief." Once the Selective Service System has taken the first step and determined under the standards set out here and in *Seeger* that the registrant is a "religious" conscientious objector, it follows that his views cannot be "essentially political, sociological, or philosophical." 398 U.S. at 342–343, 90 S. Ct. at 1798.

The initial determination is whether the plaintiff's beliefs—whatever their source or however classified in ordinary parlance—function as religious beliefs under *Seeger* and *Welsh*. The only claimants whose applications would be automatically excluded under *Welsh* would be those whose beliefs are not "deeply held" or whose claim rests solely on considerations of "policy, pragmatism, or expediency." 398 U.S. at 343, 90 S.Ct. 1792; *see* Bresette v. Knutson, 443 F.2d 179, 182 (7th Cir. 1971).

The Bureau held that Robinson's beliefs were sincere and made no attempt to characterize them as based solely on considerations of "policy, pragmatism, or expediency." Labeling them "philosophical" is insufficient since, under *Welsh*, "philosophical" is not a talismanic word. Thus, the Government argued that Robinson's beliefs do not go beyond the level of concern expressed by all responsible individuals about war so as to suggest a personal commitment to avoid participation in war. But Robinson's words belie that interpretation. The Government's conclusions are supportable only if we choose not to believe Robinson's petition, though the Bureau of Naval Personnel specifically found Robinson to be sincere. Nor can we accept the Government's suggestion that the *Seeger* standard should be more strictly applied here because the applicant has received an education. The suggested test requires a detailed analysis that would exclude nearly all but a Tillich or a Buber from conscientious objector status. Robinson satisfied his chaplain and commanding officer that his beliefs were "deeply held" and "religious" under the definition of *Seeger*. His words readily comport with that interpretation.

We find no factual support for the Bureau's second finding, that Robinson's beliefs constitute selective objection to war. The Government points to the following statement made by the petitioner in his application:

> At present I see no harm in the proper use of a non-violent type of force. It may have unlimited potential in the struggle for peace. However, an armed force used for annihilation or subjugation or as the tool of short-sighted or immoral individuals I cannot accept.

The Government interprets this statement to suggest that Robinson is opposed only to certain kinds of wars, namely, those "used for annihilation or subjugation," and is not opposed to other kinds of wars. They find that Robinson's claim is analogous to one which distinguishes between "just" and "unjust" wars and is thus insufficient under Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). This interpretation ignores the apparent thrust of Robinson's application. Though his language is awkward, we have no difficulty determining its import. The selective objection charge can only be based on distinctions Robinson makes within the category of "an

armed force." The category of "a nonviolent type of force" does not qualify as "war" under Sicurella v. United States, 348 U.S. 385, 75 S.Ct. 403, 99 L.Ed. 436 (1955). Moreover, for the petitioner, the description of an "armed force" which is used for the purposes of "annihilation or subjugation or as a tool of short-sighted or immoral individuals" completely exhausts the category of war as indicated by his statement:

> For war is and has been the bane of mankind; kindled by a minority who thwart reality in turn allowing the existence of this conflict to be perpetuated.

> I only wonder what our world would be like today if we had resolved this problem centuries ago, and I fear the form our world will take in the future if we fail to end this needless waste of human resource, WAR.

In addition, the Government tries to characterize Robinson's concern as solely directed towards the Vietnam war, rather than towards war in general. It underscores phrases in Robinson's application such as "our present plight" or references to the "dissent occurring in this country" and Americans' difficulty "in admitting we have made a mistake." These phrases are at best ambiguous. They suggest only that Robinson's beliefs may have been crystallized by opposition to the present war. Under *Welsh*, however, the fact that a claimant's beliefs are grounded in part on his perceptions of world politics does not vitiate his claim. 398 U.S. at 342, 90 S.Ct. 1792. The critical question is only whether these beliefs have now matured into an objection to participation in all wars. We find that Robinson's beliefs must be so characterized.

The judgment of the district court is reversed with the direction that the writ of habeas corpus issue discharging the petitioner from the custody of the respondents.