John McCULLOUGH, Petitioner,

v.

Robert SEAMANS, Secretary of the Air Force, et al., Respondents.

Christopher JOY, Petitioner,

v.

Robert SEAMANS, Secretary of the Air Force, et al., Respondents.

Civ. Nos. S-2127, S-2275.

United States District Court, E. D. California.

July 31, 1972.

Dwayne Keyes, U. S. Atty., Richard W. Nichols, Asst. U. S. Atty., Sacramento, Cal., for respondents.

Karlton, Blease & Vanderlaan, John M. Poswall, Sacramento, Cal., for John P. McCullough.

Jordan, Larson, Regli & Wender, Robert Regli, Berkeley, Cal., for Christopher Joy.

for the legislature to amend the statute or enact a new one at every session.

## MEMORANDUM AND ORDER

MacBRIDE, Chief Judge.

These two companion cases present an important and novel question concerning the obligations which conscientious objectors owe to their country. Simply put, the issue is whether Air Force Academy graduates who have secured their discharges as conscientious objectors before completing their active duty assignments must reimburse the Air Force for the cost of their educations.

Shortly after graduating from the Air Force Academy, both McCullough and Joy enrolled in law school under extended leave programs, thus deferring their active duty commitments for at least another three or more years. While in law school, they applied under Air Force Regulation 35–24 for discharges as conscientious objectors. Rebuked at the military level, they brought separate petitions for writs of habeas corpus in this Court to overturn the Secretary's unfavorable decisions. Filing "counterclaims" in both actions, the Air Force demanded $53,575 from each of its errant graduates to reimburse it for the alleged cost of their academy educations. After extensive hearings, I granted writs of habeas corpus in each action and consolidated the cases for decision on the issues raised by the counterclaims, which have been presented on cross motions for summary judgment.

### I

The Air Force's suit to recover the cost of petitioners' educations is unprecedented, either in the statutes, regulations, or case law. The code itself, 10 U.S.C. § 9348(b), merely provides that cadets who fail to meet their obligations may be placed in the Air Force Reserve and ordered to active duty. Air Force regulation 35–24, which prescribes the procedures for discharging conscientious objectors, imposes but two conditions on successful applicants: forfeiture of life insurance and veterans benefits, and possible alternate civilian service for those who have completed less than 180 days of active duty. The Air Force admits, indeed, that this suit rests on no specific authority and is the first of its kind.

Though novel, the suit is said to have a strong foundation in common law contract principles. By securing their discharges with writs of habeas corpus, the Air Force contends, McCullough and Joy have rescinded their agreements to become military officers in return for free educations.[1] Having done so, the argument continues, the common law requires them to restore the status quo by returning the costs of their schooling, allegedly valued at $53,575. Alternatively, the Air Force relies on the equitable principle of unjust enrichment, the theory being that it has conferred a benefit without receiving the expected exchange. Neither approach, according to the government, places an unlawful condition upon the writs such as that recently condemned in Miller v. Chafee, 462 F.2d 335 (1972), where the Ninth Circuit Court of Appeals held that an order of the district court withholding its writ of habeas corpus until a qualified conscientious objector arranged to pay for his naval education violated the First Amendment.[2]

### II

While few would truly quarrel with the basic position that persons who have taken so much from their country owe something in return, a suit for damages is hardly the medium for resolving the problem. Ostensibly seeking merely to

---

1. At the time of entering the academy, cadets must sign a statement in which they agree to complete the course of instruction and become Air Force officers. See 10 U.S.C. § 9348.

2. In this case, by contrast, the United States takes the position that its counterclaims and the petitions for writs of habeas corpus are entirely distinct and that the duty of repayment arises only if the writs should issue. Although petitioners have argued that this procedure, too, affronts the First Amendment, I have not reached the issue.

apply accepted legal theory to a new set of facts, the two counterclaims actually try to create liability where none has existed before. Whether or not the United States should forgive or recoup its loss, however, is essentially a question of fiscal policy far too involved for simple contract principles to settle. The type and the extent of the obligation which conscientious objectors like McCullough and Joy might owe their country, therefore, is a matter best left to the political processes of Congress, the branch of government traditionally charged with the duty to guard the federal purse.

The considerations which would interest Congress and perhaps be critical to its decision are generally apparent. Caught between pleas from distressed taxpayers and increasing demands for new social programs, Congress perhaps would simply conclude that the budget comes first. Proponents of some form of liability could surely muster a good deal of support among both Congressmen and the populace. Many people with much justification no doubt agree with the Air Force that it is fundamentally unfair for cadets to accept expensive educations only to file for discharges immediately after graduation. Not only does this practice waste the taxpayer's money, it also excludes other deserving students from the academies. With much to go on, therefore, Congress might well require persons like McCullough and Joy to pay their own way.

It is not too unreasonable to suppose, on the other hand, that Congress would forgive the debt entirely. Certainly attrition at the academies, whether due to illness, disciplinary problems, or whatever, has shown Congress not to expect a 100 percent return on its investiment.[3] And yet thus far it has not sought to recoup the loss. Perhaps it would feel especially compassionate towards conscientious objectors, who by hypothesis have entered the academy without any preconceived plans to trick the Air Force and have left it not because of any wrongdoing or personal fault, but only because their consciences have come to stand between them and their careers.[4] Considerations such as these may convince Congress to forgive the debt, especially since the effect on the budget would be trifling in comparison to the heavy burden which it would place on the individual.

Still another plausible alternative exists. Not unlikely, Congress would resolve the two extremes with a compromise, such as requiring alternate civilian service much like conscientious objectors perform within the Selective Service System. This procedure, although probably not entirely satisfactory to either side of the controversy, at least puts academy graduates on a par with other conscientious objectors and gives a measure of return on the federal investment without burdening the individuals with heavy payments. Like the other choices Congress could make, therefore, this alternative has much to commend it.

The trouble with the Air Force's suit is that it ignores most of these vital considerations. Since the problem is novel and the equities in my opinion roughly balanced, it would be unwise to presume in the absence of congressional guidance that the best answer is to create liability. Instead, Congress should have the first opportunity to speak, for it after all makes the law.

3. Answers to interrogatories show that cadets have left the academy for disciplinary infractions and medical reasons as well as for conscientious objection.

4. Had either McCullough or Joy entered the academy with the idea of later declaring their conscientious objection in order to obtain free educations without performing their commitments, I would have denied their petitions. This conduct would have revealed lack of sincerity and expediency. The record demonstrated, however, that neither had ill motives and that both declared their opposition to war only after a prolonged mental struggle beginning well after their enrollment.

## III

Requiring problems of this sort to be solved in Congress is not an unusual procedure. In other cases where the United States has sued to impose new forms of liability, the courts have deferred to Congress. Two Supreme Court opinions illustrate this principle particularly well.

In United States v. Standard Oil Co. of Cal., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1946), the government sued to recover medical expenses incurred in treating one of its soldiers, who had been hit and injured by the defendant's truck driver. It made a similar attempt to shift its loss in United States v. Gilman, 347 U.S. 507, 74 S.Ct. 695, 98 L. Ed. 898 (1954), where it sought indemnity from an employee whose negligence had exposed it to liability under the Federal Tort Claims Act. Although both actions had common law precedents in suits between private persons, neither had been tried before on behalf of the United States. First noting the novelty of the suits, the Supreme Court pointed out that each case actually raised issues of national fiscal concern which should be resolved only after carefully balancing policy considerations, a job which it said traditionally belongs to Congress.[5] Each opinion emphasized the dangers of applying common law principles, which have evolved chiefly in litigation between private individuals, to government problems of a financial nature.

The similarity of these two cases to the government's present effort to establish a new form of liability is striking. All three are completely unprecedented and lack even the barest of congressional direction. All are cast in terms of simple common law actions, but each actually intrudes upon Congress' province to determine our fiscal affairs. Finally, each case ignores many sensitive policy considerations which must be soundly analyzed before creating a new liability.

The decision, therefore, should be made by "those who write the laws, rather than [by] those who interpret them". See United States v. Gilman, *supra.*

## IV

Having determined that the Air Force has no right to bring its suit for damages without first asking Congress to create the liability, I have not reached the other issues raised in the briefing. Nor have I determined whether Congress could lawfully impose the liability which I have declined to extend judicially. That question must await the precise measure which Congress may enact. Since there is no genuine issue as to any material fact and because petitioners are entitled to a judgment as a matter of law,

It is therefore ordered that the government's motion for summary judgment be, and the same is, hereby denied and it is further ordered that the petitioners' motions for summary judgment be, and the same are, hereby granted.

5. While Congress overrode the decision in United States v. Standard Oil Co. of Cal. by enacting the Federal Medical Care Recovery Act, 42 U.S.C. § 2651–53, it has yet to respond to United States v. Gilman.