Richard D. SMITH, Petitioner-Appellee,

v.

Melvin LAIRD, the Secretary of Defense, et al., Respondents-Appellants,

Nos. 73-1198, 73-1199.

United States Court of Appeals, Tenth Circuit.

Submitted Oct. 2, 1973.

Decided Oct. 19, 1973.

Robert L. Shevin, Atty. Gen., Daniel S. Dearing, Asst. Atty. Gen., Tallahassee, Fla., for petitioner-appellant.

Brent Michael Turbow, Jacksonville, Fla. (Court-appointed), for respondent-appellee.

Before BELL, GODBOLD and GEE, Circuit Judges.

William A. Norris, Cummington, Mass., for petitioner-appellee.

Victor R. Ortega, U. S. Atty., for respondents-appellants.

Before LEWIS, Chief Judge, and SETH and McWILLIAMS, Circuit Judges.

PER CURIAM.

This appeal is taken by the United States from an order of the United States District Court for the District of New Mexico, 353 F.Supp. 446, granting Captain Richard D. Smith's petition for a writ of habeas corpus and discharging him from the Air Force as a conscientious objector. The writ was granted upon the express condition that Doctor Smith perform alternative service under the civilian work program administered by the Selective Service System for the duration of his active duty obligation. Doctor Smith appeals from that portion of the order making his discharge conditional. His discharge has been stayed pending appeal.

Captain Smith voluntarily entered the Air Force in June 1967 upon graduation from the University of Massachusetts. He began active duty the following September at the Georgetown University School of Medicine under a program administered by the Air Force Institute of Technology (hereinafter AFIT).[1] He was graduated from medical school in May, 1971 and in July, 1971 he began a one year Air Force sponsored internship in pediatrics at the University of Connecticut Affiliated Hospitals.

On April 27, 1971 Captain Smith was notified by letter that he was ineligible for an Air Force sponsored civilian or military residency, and that, accordingly, he should anticipate assignment to an Air Force medical facility upon completion of his internship in July of 1972. He was informed that he would be contacted in the fall of 1971 as to the geographical assignment he preferred, and

---

1. Under the program, the Air Force assumed the expenses of Captain Smith's medical education, and in exchange, he agreed to serve three years active duty for each year of medical school sponsored by AFIT. Estimates of the cost to the Air Force of Doctor Smith's education range from approximately $50,000 to $60,000.

as to his preference for assignment as either a Flight Medical Officer or a General Medical Officer.

In August, 1971 Captain Smith wrote to the Directorate of Professional Services, Office of the Surgeon General, USAF and stated that he had had previous correspondence with that Office and that he understood he would probably be assigned as a General Medical Officer following his internship. He requested information on whether he might possibly be able to continue in pediatrics. He received a response on August 17, 1971 in which was enclosed a copy of the letter of April 27, 1971, and which quoted the paragraphs in that letter informing him that he was ineligible for a sponsored residency. He was told that if there were any changes in his status, he would be contacted by AFIT.

On October 1, 1971 Captain Smith took his oath of office and was sworn in as a member of the Air Force Medical Corps. He took the oath on the advice of counsel. On the same day he notified the Air Force by letter of his intention to seek classification as a conscientious objector pursuant to Air Force Regulation 35–24 (hereinafter AFR 35–24).[2] AFR 35–24 implements for Air Force personnel the procedures set forth in Department of Defense Directive 1300.6 (hereinafter DoD 1300.6)[3] for classification of in-service applicants as conscientious objectors.

Pursuant to the requirements of AFR 35–24, Captain Smith was interviewed by a psychiatrist, a chaplain, and an investigating officer.

The investigating officer held a three-hour interview during the course of which he delved extensively into the underlying basis for Captain Smith's claim that he was entitled to classification as a conscientious objector. On March 6, 1972 the investigating officer recommended that Captain Smith's application be denied. His recommenda-

tion was adopted up through the chain of review, and on August 22, 1972 the Secretary of the Air Force disapproved the application. Thereafter, Captain Smith sought and was granted by the district court on January 3, 1973 a writ of habeas corpus securing his discharge from the Air Force.

Two issues are presented for our review: Whether there exists in the record a basis in fact for the Secretary's denial of Captain Smith's application for classification as a conscientious objector, and, if not, whether the district court could properly grant the writ on the express condition that Captain Smith serve the remainder of his active duty obligation under a civilian work program administered by the Selective Service System.

### BASIS IN FACT

■. The scope of review in a case such as this is the narrow one of whether there exists in the record a basis in fact for the denial of an in service applicant's application for classification as a conscientious objector. United States ex rel. Robinson v. Laird, 457 F.2d 741 (7th Cir. 1972); Polsky v. Wetherill, 455 F.2d 960 (10th Cir. 1972); Rothfuss v. Resor, 443 F.2d 554 (5th Cir. 1971); United States ex rel. Donham v. Resor, 436 F.2d 751 (2nd Cir. 1971).

■ To qualify for discharge from the armed forces as a conscientious objector, an applicant must establish that:[4]

1. He is opposed to war in any form, Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971);

2. His objection is grounded upon religious principles as enunciated in Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) and United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); and

2. 32 CFR § 888 [e].

3. 32 CFR § 75.

4. These criteria are incorporated in AFR 35–24 and DoD 1300.6.

3. His beliefs are sincerely held, Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955).

See also Clay v. United States, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971).

Captain Smith's application for classification as a conscientious objector was ostensibly denied on the ground that he failed to establish that his beliefs were sincerely held.

 The government concedes that Captain Smith established a prima facie case for classification as a conscientious objector. Accordingly, it is incumbent upon the government to show a basis in fact in the record for the denial of his application. A basis in fact will not find support in mere disbelief or surmise as to the applicant's motivation. Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953); Helwick v. Laird, 438 F.2d 959 (5th Cir. 1971); Bates v. Commander, First Coast Guard District, 413 F.2d 475 (1st Cir. 1969). Rather, the government must show some hard, reliable, provable facts which would provide a basis for disbelieving the applicant's sincerity, or it must show something concrete in the record which substantially blurs the picture painted by the applicant. United States ex rel. Checkman v. Laird, 469 F.2d 773 (2nd Cir. 1972); Lovallo v. Resor, 443 F.2d 1262 (2nd Cir. 1971); Helwick v. Laird, supra.

Sincerity is, of course, a subjective state of mind, and as such it does not easily lend itself to proof or disproof. The basis in fact test is, therefore, much easier to state than it is to apply to a given set of facts. Nevertheless, we have carefully reviewed the record and agree with the district court that there exists no basis in fact in the record to support the Secretary's denial of Captain Smith's application.

Preliminary to a discussion of the investigating officer's report and the reasons upon which he questioned Captain Smith's sincerity, it is pertinent to quote from the findings of the psychiatrist and the chaplain who personally interviewed Captain Smith.

The psychiatrist stated:

" . . . . I find the patient to be completely free of any psychiatric disease.

"2. In addition, after a lengthy interview, I feel the patient's beliefs are sincere and well-founded, and I have no reason to believe it could be questioned from a psychiatric standpoint." [5]

The chaplain's report read in part:

"In my opinion, Captain Smith is sincerely concerned about his role in society and honestly feels that he could not serve in any military capacity. While I feel that the reasons outlined above motivating him to become a conscientious objector are impressive and honestly portrayed, I also feel that his overall outlook lacks refinement in presentation and in content. In some measure, Captain Smith's demanding schedule can account for this shortcoming. I believe that there is no duplicity in Captain Smith's intent. On the basis of one interview, however, I cannot make any statements regarding the depth of Captain Smith's convictions. I am favorably impressed, however, by his willingness to serve in public medicine or repay his educational costs. Could such an arrangement be made, I would have no reason to doubt Captain Smith's sincerity or depth of conviction." [6]

To support his recommendation that Captain Smith's application be denied, the investigating officer essentially relied on two factors. The first factor was Captain Smith's taking his oath of office on the same day he notified the Air Force of his intention to seek classification as a conscientious objector. The second factor was the timing of the

5. R. Vol. II p. 46.

6. R. Vol. II p. 48.

application in view of the April 27, 1971 letter.

The investigating officer stated as to the first factor:

" . . . It is difficult for me to understand how an individual can take an oath, freely and without mental reservation, to defend the Constitution of the United States against all enemies, the same day he seeks status as a conscientious objector." [7]

As noted previously, however, Captain Smith took the oath of office on the advice of counsel and in his rebuttal letter to the report of the investigating officer, Captain Smith explained such superficially inconsistent actions as follows:

" . . . As I stated in the 0–3 hearing, during the first several weeks to as late as two months following my realization as a Conscientious Objector, I was very much torn between my need to live in accordance with those beliefs which formed the basis of my conscientious objection and my feelings of obligation to the Air Force for having sponsored my education through medical school. For a time I had resolved this dilemma by deciding that while I had to apply for status as a conscientious objector to satisfy the dictates of my conscience, I would not apply for discharge, that is, 1–0 status, but rather would apply for noncombatant status, that is, 1–A–0 status. I discussed this course of action with several friends at that time and am including statements of two of these people . . . . Thus it was no accident that my Oath of Office and letter stating my intention to apply for conscientious objection status were completed and mailed on the same day, for in following this course I was stating that, although I recog-

nized my obligation to the Air Force and wished to fulfill that obligation, I was nevertheless a conscientious objector and had to stand up for my beliefs." [8]

We think this explanation negates any inference of insincerity, and rather indicates that it was during the fall of 1971 that Captain Smith's beliefs began to assume concrete form.

The investigating officer stated in respect to the second factor:

" . . . In addition, the crystallization of his beliefs was stated to have occurred in connection with a letter informing him that he would probably not be serving in the Air Force as a pediatrician. Captain Smith's educational records indicate that he was aware of this fact even before he finished medical school. These facts cause me to seriously question the applicant's sincerity." [9]

 It is well settled, however, that the question is not how or when an applicant's beliefs crystallized, but rather is whether such beliefs are sincerely held, and in this regard the timing of an application is only a factor to be considered in testing those beliefs.[10]

Again, we think Captain Smith adequately negated any inference of insincerity in his rebuttal letter. He explained that he did not seek classification as a conscientious objector earlier because:

" . . . Upon reviewing the letter I received from Col. Green dated 27 April 1971, a copy of which was included in the file I received from AFIT–DPMQ, I realized that this perhaps should have been the case, [i. e. he should have realized that he would be assigned as a Flight Medical Officer or a General Medical Officer upon comple-

---

7. R. Vol. II p. 54.

8. R. Vol. II p. 66.

9. R. Vol. II p. 53.

10. It has been held, for example, that the filing of an application for classification as a

conscientious objector after receipt of orders to report to a combat zone is in and of itself insufficient grounds for denying an application. See e. g., Tressan v. Laird, 454 F.2d 761 (9th Cir. 1972); Rothfuss v. Resor, 443 F.2d 554 (5th Cir. 1971).

tion of his internship] although this was never directly stated. However, at the time I received this letter my mind and my life were very much preoccupied with events such as the state of my marital relationship . . . . [and the difficulties] I was encountering in trying to find living accomodations in Connecticut. Thus, while the beliefs leading to my later realization as a Conscientious Objector were certainly developing I, at that time, did not perceive myself as a Conscientious Objector. In addition shortly after having received this letter, and having read it no more than once, I misplaced it and, until noticing a copy of it in my file at AFIT on the day of the 0–3 hearing, never saw it again. As a result, while I was aware of having received a letter from the Air Force indicating the possibility of my being utilized as a General Medical Officer I was certainly not aware of its explicit nature, as is indicated not only by the nature of my letter of 10 Aug. 1971, but by the very fact that this letter had to be written, and until receiving Col. Anderson's letter of 17 Aug. 1971, still considered that the Air Force intended to utilize me as a Pediatrician.

In part this was due to my unawareness of the explicitness of Col. Green's letter of 27 April 1971, but also it was due to the fact that I believed that a mistake had been made, that Col. Green's office was unaware that my internship was in straight pediatrics and that I was committed to serve 10 years Active Duty Service Commitment, for it did not seem logical that the Air Force would allow me to be trained in pediatrics exclusively and then utilize me in an entirely different capacity.

Col. Gordon strongly suggests that the primary motivation behind my application for status as a Conscientious Objector was simply dissatisfication with my proposed assignment as a Flight Surgeon or General Medical Officer rather than my belief in the sacredness of the Human Spirit. Here again I must take exception with his conclusion for, although I was profoundly disturbed by the knowledge that I am scheduled to be utilized as a Flight Surgeon or a General Medical Officer, it had nothing to do with a simple preference of assignment. (Indeed, after having spent the last year to a year and a half working long hours with frequent night calls, the prospect of working something approximating a 40 hour week would hardly be unattractive.) Rather the motivating force behind my application for Conscientious Objector status was a direct result of my belief in the sacredness of the Human Spirit for as I stated in both the application and during the 0–3 hearing I had to a great degree dealt with my beliefs and their consequences by denying their meaning, rationalizing that as a pediatrician, who works only with children, I would not really be fulfilling a military role or contributing to the violation of the Human Spirit and would thus be able to serve out my obligation to the Air Force. Upon hearing that I am scheduled to be utilized as a Flight Surgeon or General Medical Officer, I could no longer deny my beliefs and their meaning to my life for, I fully realized that by fulfilling the role of either of these members of the Medical Corps I would clearly be performing a military function for the whole purpose of my work would be to help maintain the health and morale of the officers and enlisted members of the Air Force in order to insure their maximum fighting preparedness and efficiency; thus I would be playing a definite part in supporting the violation of the Human Spirit." [11]

We find nothing in the record which would support a finding of a basis in fact for denying Captain Smith's sincerity, and in this respect we note that the investigating officer was over-all favor-

ably impressed with Captain Smith's conduct during the hearing. He stated:

"Captain Smith's conduct, statements, and responses during the hearing indicated that he had spent a great deal of time developing his beliefs. These beliefs do not appear to be founded on conventional religious grounds but rather on his deep personal feeling about the welfare of all human beings.

"He does not advocate the use of violent actions for any situation; in fact, he appears to be a complete pacifist. His beliefs do not appear to be politically oriented. He apparently feels he has a duty as a citizen to try to make constructive changes in our society. He indicated that he believes his vote can produce these changes but because of his rigorous medical training has not had time to study the recent issues or to vote. He apparently feels that our government is not doing as much as is needed in our internal programs.

"However, he indicated that in his opinion our present form of government is the best available in the world today. ·

· · · ·

"Captain Smith did present a convincing case at his hearing and I believe that he in fact does strongly believe in the nonviolation of the "human spirit". I further believe that he is a dedicated medical doctor and his utmost goal, at this time, is to become a fully qualified pediatrician as soon as possible. In my estimation, it is the pursuit of this goal which has provided the primary motivation for him to seek release from the Air Force as a conscientious objector. Obvious inconsistencies in his case cause me to strongly question the sincerity of his

beliefs. I recommend that Captain Smith *not* be classified at a 1-0 conscientious objector." [12]

The investigating officer based his recommendation upon his disbelief as to Captain Smith's sincerity and his surmise as to the primary motivation for the application. Such is insufficient to support a finding of a basis in fact.

We think the record reflects the throes of a young man struggling to reconcile his growing belief that he no longer in good conscience could actively participate in the military mission in either a combat or non-combat role with the moral obligation he felt toward the Air Force for sponsoring his medical education. The conflict was brought to a head in the fall of 1971 and was resolved in favor of the conscience and the belief in the non-violation of the Human Spirit.

The government asserts that in reviewing the record, due weight must be given to the fact that eight Air Force Officers who reviewed Captain Smith's application all recommended that the application be denied. We deem of more importance, however, the reports of those who actually interviewed Captain Smith and had an opportunity to observe his demeanor.[13] Of the three officers who interviewed Captain Smith, only the investigating officer seriously questioned his sincerity and even he felt that Captain Smith had presented a "convincing case" and was a "complete pacifist".

We feel that a key factor in denying Captain Smith's application was not his insincerity, but rather the apparent unfairness in discharging him from the Air Force after having invested substantial sums in his medical education in anticipation of utilizing his medical abilities in the Air Force Medical Corps.

12. R. Vol. II pp. 52, 54.

13. The review was conducted by career officers who had no personal contact with Captain Smith. Their recommendations that Doctor Smith's application be denied were based upon inferences drawn from an in-

animate record, and all such recommendations were based not upon hard, reliable provable facts but rather were based upon disbelief as to his sincerity, or the alleged inconsistencies pointed out by the investigating officer, which we feel were adequately explained in Captain Smith's letter of rebuttal.

This requires that we turn our attention to the condition imposed upon his discharge.

## ALTERNATIVE SERVICE

The district court conditioned Captain Smith's discharge upon the express condition that he serve his remaining active duty obligation in a civilian work program administered by the Selective Service System.[14]

The condition imposed was not requested by the government nor suggested by Captain Smith in his petition filed in the district court. It was imposed *sua sponte* by the district court in a sincere effort to balance the equities involved.

The issue is admittedly a hard one: Initially, it seems patently unfair to discharge without obligation an active member of the armed forces whose professional education has been paid for by the government in anticipation of receiving the benefits of such education. Yet, it is recognized that there are members of the armed forces who develop during the course of their military experience a sincere objection based upon religious beliefs to participation in the military mission in any role, and specific regulations have been formulated for recognizing the integrity of those beliefs.

Currently, there exists no statutory authority for imposing a condition upon the release of an in-service conscientious objector who has served more than 180 days active duty.[15] Nevertheless, such judicially originated conditions have been recognized in the Fourth, Eighth and Ninth Circuits.[16] The Eighth Circuit, however, has more recently disapproved such conditions, Mosley v. Commanding Officer, 480 F.2d 1107 (8th Cir. 1973), and the Ninth Circuit has on other occasions viewed conditional discharges with disfavor. Miller v. Chafee, 462 F.2d 335 (9th Cir. 1972) ; McCullough v. Seamans, 348 F.Supp. 511 (E.D.Cal.1972).

We feel that the decision to impose conditions, if any, on the discharge of in-service conscientious objectors, including those who have had a portion or all of their education paid for by the armed forces, is a question which should be resolved in the Congress and not in the federal courts on a case by case basis.[17] We feel Judge MacBride's comments in McCullough v. Seamans, supra, are instructive on this point:

" . . . Whether or not the United States should forgive or recoup its loss, however, is essentially a question of fiscal policy far too involved for simple contract principles to settle. The type and the extent of the obligation which conscientious objectors like McCullough and Joy might owe their country, therefore, is a matter best left to the political processes of Congress, the branch of government traditionally charged with the duty to guard the federal purse.

"The considerations which would interest Congress and perhaps be critical to its decision are generally apparent. Caught between pleas from dis-

---

14. Captain Smith's remaining active duty obligation is approximately ten years.

15. Under DoD 1300.6 and AFR 35–24, an in-service conscientious objector with less than 180 days active duty can be required to participate in an alternative service program administered by the Selective Service System.

16. Strait v. Laird, 464 F.2d 205 (9th Cir. 1972) ; Packard v. Rollins, 422 F.2d 525 (8th Cir. 1970) ; United States v. Clifford, 409 F. 2d 700 (4th Cir. 1969) ; Moore v. Connell,

318 F.Supp. 884 (D.Md.1970) ; Osborne v. Seaman, 318 F.Supp. 41 (D.Md.1970).

17. Congress has already enacted some legislation in this area. For example, pursuant to 38 U.S.C. § 3103 persons discharged from the armed forces as conscientious objectors under certain circumstances are ineligible to receive benefits administered by the Veterans Administration. Pursuant to DoD 1300.6, in-service applicants for discharge as conscientious objectors must sign a waiver which incorporates the provisions of 38 U.S.C. § 3103.

tressed taxpayers and increasing demands for new social programs, Congress perhaps would simply conclude that the budget comes first. Proponents of some form of liability could surely muster a good deal of support among both Congressmen and the populace. Many people with much justification no doubt agree with the Air Force that it is fundamentally unfair for cadets to accept expensive educations only to file for discharges immediately after graduation. Not only does this practice waste the taxpayer's money, it also excludes other deserving students from the academies. With much to go on, therefore, Congress might well require persons like McCullough and Joy to pay their own way.

"It is not too unreasonable to suppose, on the other hand, that Congress would forgive the debt entirely. Certainly attrition at the academies, whether due to illness, disciplinary problems, or whatever, has shown Congress not to expect a 100 percent return on its investment. And yet thus far it has not sought to recoup the loss. Perhaps it would feel especially compassionate towards conscientious objectors, who by hypothesis have entered the academy without any preconceived plans to trick the Air Force and have left it not because of any wrongdoing or personal fault, but only because their consciences have come to stand between them and their careers. Considerations such as these may convince Congress to forgive the debt, especially since the effect on the budget would be trifling in comparison to the heavy burden which it would place on the individual.

"Still another plausible alternative exists. Not unlikely, Congress would resolve the two extremes with a compromise, such as requiring alternate civilian service much like conscientious objectors perform within the Selective Service System. This procedure, although probably not entirely satisfactory to either side of the controversy, at least puts academy graduates on a par with other conscientious objectors and gives a measure of return on the federal investment without burdening the individuals with heavy payments. Like the other choices Congress could make, therefore, this alternative has much to commend it."

Accordingly, the judgment of the district court granting Doctor Smith's discharge from the Air Force is affirmed. That portion of the order of discharge conditioning Doctor Smith's release upon alternative service in a civilian work program administered by the Selective Service System is reversed. The matter is remanded to the district court with directions to stay the order of discharge to allow the Air Force a reasonable time within which to discharge Doctor Smith in accordance with Air Force regulations. The mandate shall issue forthwith.