**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Maurice Raymond TURCOTTE,**
**Defendant-Appellant.**

**No. 73–1678.**

United States Court of Appeals,
Fifth Circuit.

Nov. 26, 1973.

---

2. Clemons v. United States, 408 F.2d 1230 (D.C.Cir.1968); Haskins v. United States, *supra*.

M. C. Mykel, Atlanta, Ga., for defendant-appellant.

J. W. Stokes, U. S. Atty., Stanley M. Baum, Beverly B. Bates, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before GEWIN, AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

Maurice Raymond Turcotte, Jr. was convicted of knowingly and wilfully refusing to submit to induction into the armed forces of the United States, in violation of 50 U.S.C. App. § 462.[1] The district court sentenced him to a three-year suspended sentence and a two-year probation period with the special condition that he serve two years' alternative service. Turcotte contended that his I–A classification was invalid because he was entitled to exemption from military training and service due to his conscientious objection to participation in war in any form.[2]

Turcotte's Selective Service File shows that he registered with the Selective Service in December 1968, following his eighteenth birthday. In February 1969 he was granted a student deferment and classified II–S. In November

---

1. This section reads in pertinent part:

"Any member of the Selective Service System or any other person charged as herein provided with the duty of carrying out any of the provisions of this title . . ., or the rules or regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty, . . . shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment, . . . ."

2. 50 U.S.C.App. § 456(j) provides for this exemption as follows:

"Nothing contained in this title . . . shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code. Any person claiming exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the armed forces under this title, ·. . ., be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be ordered by his local board, subject to such regulations as the President may prescribe, to perform for a period equal to the period prescribed in section 4(b) [section 454(b) of this Appendix] such civilian work contributing to the maintenance of the national health, safety, or interest as the local board pursuant to Presidential regulations may deem appropriate. . . ."

1969 he was classified I–A, available for military service, because of his failure to maintain the normal number of semester hours as a full-time student. However, in May 1970 he was given a I–S(C), a student deferment to the end of the academic year. On September 25, 1970, while still classified I–S(C), Turcotte sent the following letter to his Local Board, requesting a I–O conscientious objector status:

"I would also like you to know of certain ideals which have become a driving force in my life.

"Drawing much from my past religious education and from current religious thought, I must religiously object to and resist the Armed Services and conscription into such services. Because I hold these beliefs, I must request a classification of I–O.

"In anticipation of your cooperation, I thank you."

On November 4, 1970, the Local Board reclassified Turcotte I–A. On December 7, 1970, he sent the Local Board the following letter:

"I request a personal appearance before you, as I feel that I can better explain my case verbally. I also request that I may be accompanied by my own witness. In anticipation of your cooperation, I thank you."

Turcotte appeared before the Local Board on January 13, 1971, and submitted his form 150, which detailed his reasons for conscientious objection. The form includes a statement of belief in God and a summary of religious precepts which form the basis of Turcotte's objection to participation in war in any form. It gives the religious background, upbringing, and education Turcotte received from his family and from Catholicism. Turcotte also explains how he derived his beliefs from Roman Catholic teachings even though the Catholic Church itself does not teach conscientious objection. He also lists readings which contributed to his beliefs, persons with whom he has discussed such beliefs, and activities in furtherance of his views, such as affiliation with the Quaker House in Atlanta, peace vigils, group discussions, and draft counseling. Turcotte's statement also includes the following: "My ideas about war and the military did not take shape, however, until my second year at Georgia Tech. At that time I was classified 1–A and began to seriously consider the ethical problems posed by my participation in the military."

In regard to his appearance before the Local Board, Turcotte testified at trial that

"I tried to explain why I thought my belief was a religious belief, and they [the Local Board] didn't have any questions about it."

Trial transcript, p. 92.

"They [the Local Board] asked me maybe five or six questions. That's about all."

Trial transcript, p. 97.

The minutes of the Local Board make only one reference to Turcotte's personal appearance before it:

1–13–71 Made personal appearance before the Bd and on the basis of oral information and information on 150 with other evidence Bd did not feel that he qualified for 1–O.

There are no further references in the Selective Service File to indicate what the "other evidence" was, or what basis the information Turcotte presented gave for feeling that he was not qualified for a conscientious objector classification. Turcotte appealed the Local Board's decision; the Appeal Board continued him in class I–A, and he was ordered to report for induction. Turcotte went through the pre-induction process, but refused to step forward to be inducted into the Army.

■ Judicial review of Selective Service classifications is extremely limited, the range of review being the narrowest known to the law. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946); Witmer v.

United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955); Riles v. United States, 5 Cir., 1955, 223 F.2d 786; Foster v. United States, 5 Cir., 1967, 384 F.2d 372; Matyastik v. United States, 5 Cir., 1968, 392 F.2d 657; Clay v. United States, 5 Cir., 1968, 397 F.2d 901, rev'd. 403 U.S. 698, 91 S.Ct. 2068, 292 L.Ed.2d 810 (1971); McCoy v. United States, 5 Cir., 1968, 403 F.2d 896; Robertson v. United States, 5 Cir., 1969, 417 F.2d 440 (en banc); United States v. Wingerter, 5 Cir., 1970, 423 F.2d 1015; Helwick v. Laird, 5 Cir., 1971, 438 F.2d 959; Unit-States v. Stetter, 5 Cir., 1971, 445 F.2d 472; Kurtz v. Laird, 5 Cir., 1971, 449 F.2d 210. The scope of review of such cases was delineated by the Supreme Court in Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 427, 90 L.Ed. 567 (1946):

"The provision making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant." [3]

3. The provision referred to above, 50 U.S.C. App. § 460(b)(3), has been amended to codify the *Estep* holding:

". . . No judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution instituted under section 12 of this title [section 462 of this Appendix], after the registrant has responded either affirmatively or negatively to an order to report for induction, or for civilian work in the case of a registrant determined to be opposed to participation in war in any form: *Provided*, That such review shall go to the question of the jurisdiction herein reserved to local boards, appeal boards, and the President only when there is no basis in fact for the classification assigned to such registrant. . . ."

Before the decision in *Estep*, much controversy was generated as to the finality of draft board decisions and as to whether judicial review could be precluded by the provision in 50 U.S.C.App. § 460(b)(3) making "final" the decisions of the local and appeal boards and of the President. The majority opinion in *Estep* includes a reference to Conner and Clarke, Judicial Investigation of Selective Service Action, 19 Tul.L.Rev. 344 (1945). Written by two members of the Louisiana Selective Service the year before the decision in *Estep*, that article states at 346 that:

"We may concede that Congress was under no constitutional limitations when it undertook to define and impose military liability upon all persons residing in the United States. Likewise we may concede that the exemptions or special provisions for deferment were in the national interest and not in the interest of any individual. We may recognize also that Congress is free to remove any exemption or deferment or to extend the provisions of the act by appropriate amendment to the basic law. It does not follow however that the persons affected by the law are foreclosed from insisting that it be administered in conformity with the congressional mandate." [Footnotes omitted.]

It is further stated at 347 n. 14:

"From a certain point of view it would seem to be definitely in the 'national interest' to encourage the conviction that agencies of government must function according to law and are not *sui juris*. Consequently even conceding that the common good outweighs individual interests, it does not justify or require the condonation of arbitrariness or abuse of power. So far as the selective service system is concerned, its primary strength flows from the confidence it has earned because of its uniformly fair treatment of its registrants. Nonetheless the confidence of the people in their courts is such that the denial of judicial inquiry would be ominous and definitely detrimental to the national interest. . . ."

Cf. also the concurring opinion of Mr. Justice Murphy, Estep v. United States, 327 U.S. at 132, 66 S.Ct. at 432:

". . . In this instance it seems highly improbable that the war effort necessitates the destruction of the right of a person charged with a crime to obtain a complete review and consideration of his defense. As long as courts are open

■ The standard by which we measure the validity of Turcotte's defense is whether there is a basis in fact for the Selective Service Board's refusal to grant Turcotte a conscientious objector exemption. The basis in fact test has been elaborated by the Supreme Court and by this Court. In Witmer v. United States, 348 U.S. 375, 381–382, 75 S.Ct. 392, 396, 99 L.Ed. 428 (1955), the Supreme Court said:

> "In conscientious objector cases, therefore, any fact which casts doubt on the veracity of the registrant is relevant. . . . If, as here, the issue is the registrant's sincerity and good faith belief, then there must be some inference of insincerity or bad faith."

This Court has said in Kessler v. United States, 5 Cir., 1969, 406 F.2d 151, 156:

> ". . . the disbelief of Selective Service officials will not justify the rejection of a claim for conscientious objector status unless there is some affirmative evidence to support the ·rejection of the claimed exemption or there is something in the record which *substantially* (emphasis added) blurs the picture painted by the registrant and thus casts doubt on his sincerity, Batterton v. United States, 8 Cir., 1958, 260 F.2d 233."

We said in Helwick v. Laird, 5 Cir., 1971, 438 F.2d 959:

> ". . . the Board is not at liberty merely to disbelieve the claimant. There must be some facts in his application—hard,. provable, reliable facts —that provide a basis for disbelieving the claimant."

*See also* Riles v. United States, 5 Cir., 1955, 223 F.2d 786; Wood v. United States, 5 Cir., 1967, 373 F.2d 894, vacated on other grounds, 389 U.S. 20, 88 S. Ct. 3, 19 L.Ed.2d 20 (1967); Greer v. United States, 5 Cir., 1967, 378 F.2d 931; Foster v. United States, 5 Cir., 1967, 384 F.2d 372; Jones v. United States, 5 Cir., 1968, 387 F.2d 909; Matyastik v. United States, 5 Cir., 1968, 392 F.2d 657; Clay v. United States, 5 Cir., 1968, 397 F.2d 901, rev'd. 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971); Merritt v. United States, 5 Cir., 1968, 401 F.2d 768; McCoy v. United States, 5 Cir., 1968, 403 F.2d 896; Robertson v. United States, 5 Cir., 1969, 417 F.2d 440 (en banc); United States v. Wingerter, 5 Cir., 1970, 423 F.2d 1015.

■ The concept of conscientious objection has been defined judicially as follows:

> "An applicant for classification as a conscientious objector must satisfy three basic tests. He must show that he is conscientiously opposed to war in any form, Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168, 1971; that his opposition is based upon religious training and belief, as that term has been construed, Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308, 1970; United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733, 1965; and that his objection is sincere. Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428, 1955."

Kurtz v. Laird, 5 Cir., 1971, 449 F.2d 210, 211. In his written statements on form 150, Turcotte clearly stated that he is conscientiously opposed to war in any form. He also stated that this opposition · derives from religious beliefs. There remains the question of his sincerity. But the Local Board did not ask Turcotte any questions as to his sincerity or as to the "religious" quality of his beliefs, and the minutes of the Local Board have provided us with nothing but the cryptic statement, "on the basis of oral information and information on

---

and functioning judicial review is not expendable.

"All of the mobilization and all of the war effort will have been in vain if, when all is finished, we discover that in the process we have destroyed the very freedoms for which we fought. These cases represent a small but significant reflection of that fact. The reversal of the judgments below is therefore in line with the highest traditions of the Court."

150 and with other evidence Bd did not feel that he qualified for 1–O." Furthermore, according to Turcotte's trial testimony and to the record we have before us, there is no indication that the "oral information and information on 150" do anything other than support Turcotte's position. A diligent search through Turcotte's entire Selective Service File convinces us that there was no evidence to contradict his claim. Therefore, we find no basis in fact for the denial of his classification as a conscientious objector.

■ The Government argues that the timing of Turcotte's request for the conscientious objector form might have supplied some basis for the denial of I–O status. A resume purportedly prepared by an employee of the Local Board and forwarded to the Appeal Board states that "his request for conscientious objector classification seemed to have been made at his own convenience." However, development of conscientious objection to participation in war can occur even after induction and after a period of service in the military. Rothfuss v. Resor, 5 Cir., 1971, 443 F.2d 554; Helwick v. Laird, 5 Cir., 1971, 438 F.2d 959; Ehlert v. United States, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971).[4] We have also held that "lateness in and of itself will not support a finding of insincerity," United States v. Brown, 5 Cir., 1972, 456 F.2d 983, 985, cert. denied, 409 U.S. 886, 93 S.Ct. 108,

34 L.Ed.2d 143 (1972), and that "the timing of an application, as a solitary fact without other support in the record, is by itself not enough to provide a basis in fact for rejection of a prima facie showing of conscientious objection." Rothfuss v. Resor, *supra* at 558 of 443 F.2d. However, in the instant case, as in United States v. Stetter, 5 Cir., 1971, 445 F.2d 472, and United States v. Wingerter, 5 Cir., 1970, 423 F.2d 1015, Turcotte had a student deferment when he applied for the conscientious objector form. As pointed out in *Stetter,* at 480–481 of 445 F.2d, it is not incumbent upon a registrant to seek conscientious objector status while he maintains a student deferment.

Even though our scope of review is limited we find that appellant has set forth a bona fide and uncontradicted claim to conscientious objection. We said almost twenty years ago, "Congress in its wisdom considered it more essential to respect a man's religious belief than to force him to serve in the armed forces. The draft boards and the Courts are bound to carry out that policy." Williams v. United States, 5 Cir., 1954, 216 F.2d 350, 352. Having found no evidence to contradict Turcotte's claim of conscientious objection, or any basis in fact for denying him a I–O classification, we reverse the judgment below and order that a verdict of acquittal be entered.

Reversed.

4. "The very existence of Army Regulation 635–20 [governing consideration of conscientious objector claims which occur subsequent to entry into active military service] is a recognition of the fact that crystallization of conscientious objector beliefs may occur as readily after induction as before. Further, the courts have recognized that crystallization may occur in the face of imminent induction or after considerable time spent in military service." Rothfuss v. Resor, 5 Cir., 1971, 443 F.2d 554, 558. "It defies logic and experience to assert that an Army recruit's views toward the military could not change during the time he goes through basic training. Indeed, the very purpose of basic training is to break down the recruit's civilian orientation and orient him in the ways of military life." Helwick v. Laird, 5 Cir., 1971, 438 F.2d 959, 967.