Gilbert P. HAGER, M.D., etc., Petitioner, Appellant,

v.

SECRETARY OF the AIR FORCE and Commanding General, Hanscom Air Force Base, Massachusetts, Respondents, Appellees.

No. 91–1103.

United States Court of Appeals, First Circuit.

Heard April 5, 1991.

Decided July 18, 1991.

As Amended July 25, 1991.

Peter A. Fenn with whom Melinda Drew and Fenn and King, were on brief, Jamaica Plain, Mass., for petitioner, appellant.

Annette Forde, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief, Boston, Mass., for respondents, appellees.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BOWNES, Senior Circuit Judge.

Petitioner-appellant Gilbert P. Hager, M.D., a captain in the United States Air Force, appeals from the district court's denial of his petition for a writ of habeas corpus seeking discharge from the Air Force on the ground that he is a conscientious objector. Dr. Hager had petitioned for the writ after respondent-appellee, the Secretary of the Air Force ("the Secretary"), denied his application for conscientious objector status.

## I. BACKGROUND

In 1981 Gilbert Hager joined the Air Force Reserves and was commissioned a second lieutenant in the Air Force Medical Services Corps. Under the Health Professional Scholarship Program ("HPSP") he attended medical school, receiving from the Air Force a monthly stipend and tuition, amounting to approximately half the cost of his medical school expenses. Upon graduation Dr. Hager was to serve as an Air Force physician for four years. Commissioned a captain when he finished medical school in 1985, Dr. Hager sought and was granted a deferment of his active duty assignment in order to pursue post-graduate training in the specialty of physiatry (physical medicine and rehabilitation). He completed his post-graduate training in 1989, none of which was subsidized by the Air Force.

As the end of his studies drew near and two months before being called to active service, Dr. Hager submitted his resignation and application for separation from the Air Force on the grounds of conscientious objection to participation in war in any form. Offering to perform alternative, non-military service and to pay back the Air Force for its contribution to his medical education, Dr. Hager stated in his discharge application that his religious and moral beliefs prevented his continued participation in any organization whose mission is the "mass delivery of death and destruction." He explained that he had been raised a member of the Baptist church and while in high school had also become interested in other world religions and philosophies, including Buddhism, Hinduism and Taoism. A year spent in India during college in 1969–70 further influenced his developing religious beliefs. In 1988 he met and married a Japanese–American woman who had been raised Buddhist. Because of their "affinity for both Christian and Buddhist ideals," they were married by a Buddhist monk and again by a Protestant minister the following day. He described the nature of his conscientious beliefs as follows:

My religious and moral convictions are derived from the study of many of the world's great religions. I believe the ideas of religion and philosophy that are truly useful to quality living are those which are shared by most religious schools of thought, and I have found that almost all of the religions of the world share the belief that one should not kill. In the Judeo–Christian tradition this basic moral tenet is stated quite simply as one of the Ten Commandments, and Jesus taught that one should even turn the other cheek when confronted by violence. In Hinduism the ideal of Ahimsa is to avoid the destruction of life in any form. In my view, one of the greatest guidelines for human behavior is the Golden Rule which tells me that I should never do to someone else what I would not have done to me. I do not want anyone to kill me or create pain and suffering in my life, so I must not kill others or contribute in any way to their misery. To me it is morally wrong, therefore, and against my conscience to take a human life.

My concept of a Supreme Entity or God is that of a Guiding Energy that helps the Universe to unfold within the Time–Space continuum and according to the laws of physics. To me, there seems

to be a flow to the unfolding that the Taoists call the Way. Atoms, molecules, inanimate objects, plants, and animals have no choice but to follow the Way, as it is inherent in their nature. Of all the entities that inhabit the physical world, Humans are the only ones who have the option to resist the Way, and it is this resistance that brings us unhappiness. This to me is what is meant by the term Sin, which the Theologian, Paul Tillich, defines as the state of separation from oneself, other people, and God. One can endeavor to reduce this separation and stay in harmony with the Way (with God) through meditation (prayer), and if one succeeds then one has attained Nirvana, the blissful state of enlightenment, which I feel is the same as Salvation.

I believe in the Hindu and Buddhist ideal of Karma which strengthens my resolve against killing by reminding me of the cause and effect nature of our existence. In other words, my actions have repercussions which will affect not only my future life but also the lives of others as well as the environment in which we live. I feel I must be careful to act in such a way that I create good Karma rather than bad in order to contribute to the good of humanity, and not to the continuation of pain and suffering. Again it is meditation and prayer that guides me in making the choices that will create good Karma, reduce my Sin, and help me to stay in harmony with God.

I also subscribe to the Mahayana Buddhist Boddhisattva ideal which teaches that an important component of striving for one's own enlightenment (salvation) is the development of compassion for others, as manifested by the desire to help them in their suffering, both physical and spiritual, and to lead them whenever possible toward their enlightenment. Inherent in this ideal is the belief that there is one Life Force which connects all living beings, so the prevention of suffering for one requires the prevention of suffering for all. Compassion leads one to make sacrifices in one's own life for the good of others and especially for the common good of all humanity.

\*   \*   \*   \*   \*   \*

As a physician who believes in the oneness of humanity and the precious nature of the Life Force, I cannot reconcile the concept of an enemy. To me all the people of the world are part of my Community, no matter what race, creed, or political affiliation, and I cannot conceive of a circumstance where I would participate in or condone the killing of any of them.

According to Dr. Hager he began thinking about his role in the military in early 1988 when he visited the hospital at Lackland Air Force Base in Texas, where he would most likely be stationed. There it was explained to him that the physical medicine and rehabilitation training he had received would be essential during wartime for rehabilitating troops for return to battle.

His marriage to a Japanese–American woman spurred Dr. Hager to think more seriously about his "humanitarian ideals" and to consider the impact another war against an Asian country would have on his future children, half of whose blood would be Asian. In early 1989 he "began to feel within [him] a growing conflict between [his] religious and moral values and [his] obligation to serve on active duty in the Air Force." According to Dr. Hager:

About that time I treated a little boy from Guatemala who is paralyzed from the waist down because a bullet fired reportedly by the Contras missed his father and entered his spine. I am morally outraged by this violent act, which I consider to be the direct result of the philosophy that war and violence are acceptable ways to achieve an end, and I know that I cannot participate in any way in the continuation of that philosophy.

Inevitably, my religious views and prayer led me to the inescapable conclusion that I am a Conscientious Objector to war in any form and cannot serve on active duty in the Air Force in any capacity. I know from being married to a woman of another race and from having

thought and prayed deeply about my religious beliefs, that I am part of the extended family of mankind that unites all races. I know now that I cannot participate in war anytime, anyplace, for any reason. For me it is fundamentally wrong to participate in any military organization, and I cannot violate my conscience by doing so.

In addition to his application for discharge Dr. Hager submitted eight witness statements attesting to his sincerity. Among them was a statement from Vincent deGregoris, Professor of Pastoral Psychology from the Eastern Baptist Theological Seminary, who stated he had known Dr. Hager for over twenty years and had recently had a conversation with him about his religious and moral beliefs. Professor deGregoris stated that he was "convinced that [Dr. Hager] is sincere in conscientious objection to further connection with the Armed Forces. This has not been an easy decision for him and is the result of some deep inner struggles." Reverend Harrington M. Gordon, Jr., Dr. Hager's parish priest, stated that he had known Dr. Hager "since he was a young boy. He is an honorable gentleman and honest." After speaking with Dr. Hager on the subject, Rev. Gordon was of the opinion that Dr. Hager's request for a discharge "has come about in his life by a long period of *thinking* and *sorting out* and actually coming to know his own mind in this area of being a Conscientious Objector to War, its means, its destruction...." (Emphasis original).

Pursuant to Air Force Regulation ("AFR") 35–24[1] Dr. Hager was interviewed by a chaplain and a psychiatrist,[2] who filed written reports based on their interviews. Captain Dwight Robson, the Protestant chaplain, met with Dr. Hager on two separate occasions and concluded:

[W]hile Captain Hager is opposed to war in any form it is not based upon religious conviction or upon moral or ethical beliefs which have been developed systematically or concretely. In talking with Captain Hager, I found very little evidence of a belief system which I could describe as a deeply held moral or ethical belief to which all else is ultimately dependent, and which has the power or force to effect moral well-being (AFR 35–24). Further while Captain Hager is quite sincere about his request for discharge, I did not find that he possesses a sincere and meaningful belief that occupies a place in his life which is parallel to that filled by the God of another, or a belief held with the strength and devotion of traditional religious conviction in accordance with AFR 35–24.

Also pursuant to AFR 35–24, Dr. Hager appeared at a hearing held before Major David Pronchick, the investigating officer. In his subsequent report Major Pronchick stated with respect to Dr. Hager's religious beliefs that "it seems as if they are superficial, perhaps due to the recent onset of his convictions." With reference to Dr. Hager's testimony that serving in the military was at odds with his Hippocratic Oath, Major Pronchick found that "[t]his belief did not appear to be deeply held, especially with the realization of how long ago Captain Hager took this oath." He stated further, "While I do not question Captain Hager's sincerity, it is my opinion that his beliefs are neither firm nor fixed." In conclusion he recommended that Dr. Hager "not be classified as a CO" but instead "be ordered to extended active duty."

After the chaplain's and investigating officer's reports were furnished to Dr. Hager, he submitted a rebuttal. The final decision was made by the Secretary based on the entire record, comprised, pursuant to AFR 35–24 ¶ 18c(6), of all the material submitted by Dr. Hager, reports of interviews and evidence received at the hearing. The Secretary's decision in full stated:

---

1. AFR 35–24 governs applications for conscientious objector discharge by Air Force personnel and implements the procedures for conscientious objector discharge promulgated by the Department of Defense and set forth at 32 C.F.R. § 75.

2. The psychiatrist's report, evaluating only for psychiatric or personality disorders, is not relevant here.

The Secretary of the Air Force declines to approve the application for discharge as a conscientious objector submitted by Captain Gilbert P. Hager, 037–32–4537FV, and the resignation he tendered pursuant to AFR 35–41, Volume III, paragraph 4–9e. The Secretary finds that Captain Hager failed to establish, by clear and convincing evidence, that he is opposed to war in any form and that his beliefs are sincere and deeply held. The reasons for the denial include, but are not limited to, the following considerations. Applicant has not fulfilled his burden of proof which requires him to establish, by clear and convincing evidence, that he has an honest, sincere, and deeply held belief which serves as the basis of his claim to conscientious objector status. There is little evidence he has developed a coherent belief system which could be described as firm, fixed and deeply held. Further, there is no indication Captain Hager's CO belief has become "the primary controlling force in [his] life" as required by AFR 35–24, paragraph 21.

## II. DISCUSSION

■■■■ The long-established test for conscientious objector status, applying equally to in-service personnel and draft registrants, *Armstrong v. Laird,* 456 F.2d 521, 523 (1st Cir.1972), has been spelled out by the Court:

In order to qualify for classification as a conscientious objector, a registrant must satisfy three basic tests. He must show that he is conscientiously opposed to war in any form. *Gillette v. United States,* 401 U.S. 437 [91 S.Ct. 828, 28 L.Ed.2d 168 (1971)]. He must show that this opposition is based upon religious training and belief, as the term has been construed in our decisions. *United States v. Seeger,* 380 U.S. 163 [85 S.Ct. 850, 13 L.Ed.2d 733 (1965)]; *Welsh v. United States,* 398 U.S. 333 [90 S.Ct. 1792, 26 L.Ed.2d 308 (1970)]. And he must show that this objection is sincere. *Witmer v. United*

States, 348 U.S. 375 [75 S.Ct. 392, 99 L.Ed. 428 (1955)].

*Clay v. United States,* 403 U.S. 698, 700, 91 S.Ct. 2068, 2070, 29 L.Ed.2d 810 (1971). "[T]he ultimate question ... is the sincerity of the [applicant] in objecting, on religious grounds, to participation in war in any form." *Witmer v. United States,* 348 U.S. at 381, 75 S.Ct. at 395. The Secretary's denial of the application must be supported by a statement of reasons, *United States ex rel. Checkman v. Laird,* 469 F.2d 773, 780–81 (2d Cir.1972), and will be upheld on review if there is a "basis in fact" for the decision. *Lobis v. Secretary of the United States Air Force,* 519 F.2d 304, 306 (1st Cir.1975) (citing *Bates v. Commander, First Coast Guard District,* 413 F.2d 475, 477 (1st Cir.1969)). *See also, e.g., Shaffer v. Schlesinger,* 531 F.2d 124, 127 (3d Cir. 1976). Although this standard of review is a narrow one, it is not toothless.

A basis in fact will not find support in mere disbelief or surmise as to the applicant's motivation. Rather, the government must show some hard, reliable, provable facts which would provide a basis for disbelieving the applicant's sincerity, or it must show something concrete in the record which substantially blurs the picture painted by the applicant.

*Smith v. Laird,* 486 F.2d 307, 310 (10th Cir.1973) (citations omitted). The reasons relied upon by the Secretary must be grounded in logic, *Checkman,* 469 F.2d at 787, "and 'a mere suspicion is an inadequate basis in fact.' *Shaffer v. Schlesinger,* [531 F.2d] at 131." *Goldstein v. Middendorf,* 535 F.2d 1339, 1344 (1st Cir.1976). With these standards in mind, we turn to the decision of the Secretary.[3]

The Secretary's final decision, set forth above, consists of conclusory reasons in language tracking that of the regulations. *See* AFR 35–24 ¶ 1a ("firm, fixed and sincere objection by reason of religious training and belief to ... participation in war in any form"); AFR 35–24 ¶ 21a ("the belief

---

**3.** Although the district court found a basis in fact for the denial of Dr. Hager's application, our review of the action of the Air Force is plenary. *See, e.g., Goldstein v. Middendorf,* 535

F.2d 1339 (1st Cir.1976); *Bates v. Commander, First Coast Guard District,* 413 F.2d 475 (1st Cir.1969).

on which conscientious objection is based must be the primary controlling force in the applicant's life.") The reasons given for denying a conscientious objector application must be logical; "[t]his is a meaningful requirement, and one that cannot meaningfully be satisfied by a bare recitation by the [Secretary] of the ultimate statutory criteria...." *Checkman*, 469 F.2d at 787. The use of "boilerplate" language by the Secretary, however, is not improper so long as the reasons relied upon are reasonably discoverable from the record. *Sanger v. Seamans*, 507 F.2d 814, 818 (9th Cir.1974). Because the Secretary necessarily relies on the opinions and recommendations of his subordinates, it is the reports of the chaplain and the investigating officer to which we must look for a basis in fact to uphold the decision. *See Goldstein*, 535 F.2d at 1341 (reviewing underlying findings of investigating officer that had been "subsequently ratified by the Secretary").

■ Chaplain Robson's report begins with his conclusion that Dr. Hager "does not reflect sincerity or deeply held moral and ethical beliefs which are consistent with the requirements of AFR 35–24." For his "reasons for this conclusion," he begins with a summary of the information obtained from Dr. Hager as to "the nature of his beliefs," "how his beliefs developed and from what sources," and "[i]n further explanation of the development of his beliefs":

... Captain Hager says that he believes in the ideals of several world religions and states that he became a physician to fulfill his need to contribute to society in the way that his beliefs have guided him.

... Captain Hager says that he first became interested in world religions while in high school. Though no specific courses of instruction were noted, he held discussions with his father which further sparked his interest. Subsequently he was exposed to several Eastern Religions while attending college.

... Subsequently, through working with his father in the practice of medical care, he was inspired to pursue a career in the field of medicine which in his mind would put him back on track with his goals to serve humanity in accordance with his developing religious beliefs.[4]

The chaplain then states the relevance of this summary:

At the time of his acceptance of the Air Force Health Professional Scholarship, Captain Hager did not claim to be a conscientious objector. This fact casts serious doubt as to the sincerity and meaningfulness of the development of the beliefs Captain Hager describes above, since these beliefs are reported to have taken shape previous to his desire to pursue a career in medicine.

We can only conclude that the chaplain's doubts about Dr. Hager's sincerity are based on the timing of the crystallization of his conscientious objector beliefs. It is universally the law, however, that late crystallization of conscientious objector convictions is not a sufficient basis in fact to reject the claim. *Lobis v. Secretary of the United States Air Force*, 519 F.2d at 304. *See also Shaffer v. Schlesinger*, 531 F.2d at 130 ("cases are legion which hold that the timing of an application for conscientious objector status is not a sufficient basis in fact to support a finding of insincerity"); *United States v. Turcotte*, 487 F.2d 417, 422 (5th Cir.1973) (same); *Smith v. Laird*, 486 F.2d at 311 (same). That Dr. Hager was not a conscientious objector when he volunteered for the Air Force Reserves in 1981 is not dispositive of the sincerity of his conscientious objector convictions today. As the Third Circuit explained in *Shaffer*, where the Army sought to justify denial of conscientious objector status in part because Shaffer had volun-

---

**4.** The chaplain had also stated that Dr. Hager "seems to relate in his request that he strayed from his quest to serve humanity" when "he left college to pursue a career as a songwriter and performer." In his rebuttal letter Dr. Hager objected to this characterization, contending, "I felt that my involvement with the arts was a way in which I could serve humanity by raising the spirits and the consciousness of my audience. It was my path at that time of my life prior to my discovery of a more meaningful one."

tarily entered ROTC, "It is long since settled that voluntary assumption of military obligations does not provide a basis in fact for a finding of insincerity." 531 F.2d at 129. Shaffer, as did Dr. Hager, acknowledged that he had not been a conscientious objector when he signed up. Rather, "[h]is views evolved and congealed over a period of years and it would be illogical and indeed inconsistent with [the regulation permitting in-service conscientious objector applications] to hold that because he once voluntarily participated in the military, he could not thereafter sincerely assert conscientious objector beliefs." *Id.* at 129–130. *See also Ferrand v. Seamans,* 488 F.2d 1386, 1390 (2d Cir.1973) (denial of conscientious objector status to one who enlisted under Berry Plan for medical school deferment for no reason other than late crystallization "would leave no room at all for in-service conscientious objection").

We recognized a similar dilemma in *Bates v. Commander, First Coast Guard District,* 413 F.2d 475. Under DOD Directive 1300.6 IV B2, which parallelled 32 C.F.R. § 75.4(a)(1), conscientious objection by a member of the military could not be considered if it arose prior to entry into the service. Bates, who had enlisted but later applied for a conscientious objector discharge, claimed, as does Dr. Hager, that his newborn conscientious objection arose "[b]y reason of prior religious training and my developing beliefs...." 413 F.2d at 476. We noted that "by holding that petitioner's present claim is inconsistent with his prior voluntary enlistment, the Commandant puts him in a 'hanged if he does, hanged if he doesn't' predicament. ... By the Commandant's reasoning ... petitioner's claim cannot be considered if it arose prior to his enlistment and is evidence of insincerity if it arose afterwards." *Id.* at 478.

We were not persuaded by such reasoning in *Bates* and are not now. Although

the timing of the application for conscientious objector status may be accorded some weight, *Lobis,* 519 F.2d at 307, it cannot alone constitute a basis in fact for denying conscientious objector status. *Id.*

Several other reasons cited by the chaplain essentially implicate timing as well and are similarly insufficient. He notes that Dr. Hager told him that the application process itself helped him to formulate his position. This is no more than a restatement by Dr. Hager of the response in his application to the Air Force's request for "[a]n explanation as to when these beliefs became incompatible with military service, and why."[5] *See* AFR 35–24, Attachment 1. That his views developed to the point of crystallization around the time of his application is no bar to finding sincerity. *See Tressan v. Laird,* 454 F.2d 761, 762 (9th Cir.1972) (conflict between duty and conviction against all killing resolved by filing application; lateness not indicative of insincerity). This response relates only to timing and adds nothing to the late-crystallization rationale for denying the application. In addition, the chaplain's reference to Dr. Hager's claim that the rigors of eight years of medical school "thwarted" development of his beliefs is merely another attack on the belatedness of Dr. Hager's convictions. Although the chaplain repeats Dr. Hager's statement that because of his academic workload "he had 'virtually no time or energy for spiritual and moral reflection,'" he expresses no doubt about its accuracy. We will accord this purported reason no weight.

Chaplain Robson does appear specifically to question Dr. Hager's sincerity, at least indirectly, with respect to the professed impact on him of his visit to the Air Force hospital, at which time he "was confronted with the realization that his role in the military would include rehabilitation of troops in preparation for return to battle, a fact that up until this point he *claims* to

---

5. In his application he answered:
   I became a Conscientious Objector to military service about the time of filing this application. My realization came gradually and with great difficulty, because I am not one who takes his commitments lightly, but after considerable contemplation, meditation, and exploration of my deepest held convictions in the light of my religious and moral beliefs, I have found that my convictions are incompatible with military service.

have given no serious consideration." (Emphasis added). If the chaplain means to suggest that he does not find Dr. Hager credible, he points to no objective evidence to support his disbelief. His disbelief "must be 'honest and rational,' and 'a mere suspicion is an inadequate basis in fact.'" *Goldstein,* 535 F.2d at 1344 (citations omitted).

Dr. Hager "provided a plausible explanation," *Lobis,* 519 F.2d at 307, for the gradual development and maturation of his beliefs. According to his application, his father was the catalyst for both his interest in rehabilitation medicine and an Air Force medical career. Through caring for his father after a stroke he "resolved to pursue a health care career," and out of a "desire to emulate" him, to become an Air Force doctor. He therefore applied for the Air Force scholarship. Throughout his medical school career, he "became so absorbed in the intensity of [his] training that [he] had virtually no time or energy for spiritual and moral reflection." Only as he neared the end of his training did he directly face, at an Air Force Base medical facility, the reality of rehabilitation medicine in the military, i.e. that he would be "instrumental in rehabilitating troops in preparation for return to battle," and reflect on the fact that his function would be "to bolster the fighting power of the Air Force." We do not find it remarkable in these circumstances, or undermining of sincerity, either that Dr. Hager did not have this realization sooner or that he, once acquiring it, did not act on it immediately. "[I]t 'has always been regarded as consistent with spirituality and nobility of character for men of conscientious scruples to continue to examine a moral problem until the final hour of decision, and meanwhile to reflect on their respective duties to conscience and to the social order.'" *Solomon v. Seamans,* 331 F.Supp. 1099, 1103 (D.Mass.1971) (quoting *Silberberg v. Willis,* 306 F.Supp. 1013, 1021

(D.Mass.1969), *aff'd,* 420 F.2d 662, 664 n. 1 (1st Cir.1970)).

■ As the final reason in support of his conclusion, the chaplain focuses on Dr. Hager's "explanation of how his daily lifestyle has changed as a result of his beliefs," and on what Dr. Hager believed to be a "conspicuous demonstration of the depth of his beliefs."[6] The chaplain stated:

> Captain Hager says "I have taken the time for meditation and contemplation in clarifying my moral and religious beliefs." While this statement seems to express sincerity, in my opinion it does not demonstrate a change in lifestyle. In fact in the applicant's opinion the only conspicuous demonstration of the depth of his beliefs is to walk away from the opportunity the Air Force has offered him to practice medicine in an outstanding and rewarding environment.

Chaplain Robson's dismissal of Dr. Hager's asserted lifestyle change does not provide a basis in fact. First, as we have noted in prior cases involving in-service physicians, an "'alleged failure to manifest his newfound convictions in a changed lifestyle, ... seems of minor significance at best. [His] ... medical career was of a nature commonly supposed to be oriented towards public service, and there was no evidence, before or after crystallization, of habits or life-style incompatible with sincerely held CO beliefs.'" *Goldstein v. Middendorf,* 535 F.2d at 1343 n. 6 (quoting *Lobis v. Secretary of the United States Air Force,* 519 F.2d at 307 n. 2). The same may be said of the evidence here.[7]

Moreover, the chaplain's opinion utterly discounts the daily lifestyle changes that Dr. Hager did assert: regular meditation and contemplation. That in the chaplain's opinion this "does not demonstrate a change in lifestyle" may show no more than the chaplain's own lack of familiarity with the Eastern religious teachings to which Dr. Hager subscribes. In "Bud-

---

**6.** These explanations were specifically required by the Air Force as part of the application for conscientious objector discharge. *See* AFR 35-24, Attachment 1.

**7.** In addition, Dr. Hager's application reports a lifestyle change in that he has joined Physicians for Social Responsibility, an organization whose mission is "to spread the message that there can be no effective medical response to nuclear war."

dhism, God may not be the ultimate reality and the response may be meditation ... rather than prayer." *May v. Cooperman,* 572 F.Supp. 1561, 1569 (D.N.J.1983), *aff'd,* 780 F.2d 240 (3d Cir.1985). Indeed, the Supreme Court has recognized that "meditation ... may be a form of prayer." *Wallace v. Jaffree,* 472 U.S. 38, 59 n. 47, 105 S.Ct. 2479, 2491 n. 47, 86 L.Ed.2d 29 (1985) (statute authorizing moment of silence in public schools for prayer or meditation violated First Amendment). While the idea of meditation as a form of prayer may be foreign to the Protestant Chaplain, that fact is an impermissible basis on which to evaluate Dr. Hager's change in lifestyle. *Cf. Clay v. United States,* 403 U.S. at 700, 91 S.Ct. at 2070 (in applying conscientious objector tests, military must be concerned with applicant "as an individual, not with its own interpretation of the dogma of the religious sect"); *Bates v. Commander, First Coast Guard District,* 413 F.2d at 480 ("hearing officer's subjective interpretation of petitioner's beliefs, when the Court has said the question is essentially an objective one," is "disturbing").

Furthermore, in stating that Dr. Hager mentions only his walking away from the rewarding Air Force career opportunity as "conspicuous demonstration of the depths of his beliefs," the chaplain misstates the evidence. In his application Dr. Hager also expressed his anxiety over abandoning the "family tradition of serving in the military corps." Perhaps most conspicuously Dr. Hager declared his unsolicited willingness to reimburse the Air Force for money spent on his education, even though to do so "would add considerably to [his] financial burden, which is already substantial considering [his] indebtedness for necessary expenditures not paid for by the Air Force." There is no objective basis to support the chaplain's opinion in this regard.

What remains after our review of the chaplain's stated reasons for his opinion are the purported suspicious timing of the conscientious objector application and the absence of a major lifestyle change. Both

of these elements together we found to be an insufficient basis in fact in *Lobis,* where "the principal other evidence [was] the Investigating Officer's finding of sincerity made after face-to-face interview." 519 F.2d at 307–308.

Although Chaplain Robson specifically questions Dr. Hager's sincerity,[8] the express ground is only on the timing of the application, an insufficient reason to doubt sincerity. *Id.* There is no evidence of any actions taken by Dr. Hager inconsistent with his stated beliefs. *Cf. Koh v. Secretary of the Air Force,* 719 F.2d 1384, 1385–86 (9th Cir.1983) (that claimant filed two previous discharge applications on grounds other than opposition to war and enrolled in medical training program that conflicted with military commitments, supported insincerity finding); *Johnson v. Commanding Officer, USS Casimir Pulaski,* 423 F.Supp. 10, 15 (D.Conn.) (rational basis to reject claim of sincerity where claimant postponed application for over a year after beliefs admittedly formed), *aff'd without opinion,* 556 F.2d 573 (2d Cir.1976). Nothing points to a conclusion that Dr. Hager's beliefs are incompatible with a sincerely held conviction against participation in all wars or that they are not religiously based. *Cf. Lovallo v. Resor,* 443 F.2d 1262, 1265 (2d Cir.1971) (where claimant did not object to posting in Germany, only in Korea, and espoused "right to pick and choose the war in which he would engage," factual basis to doubt sincerity); *Chapin v. Webb,* 701 F.Supp. 970, 979–80 (D.Conn.1988) (basis in fact where claimant believed in defensive wars, admitted no lifestyle changes made or contemplated, and never stated his religious beliefs required him to refrain from war). All we are left with is the chaplain's conclusory recitation, in the language of the regulations, of his subjective disbelief in Dr. Hager's claim of conscientious objection. But "a mere *ipse dixit* disbelief is not sufficient support for such a determination [of insincerity] without affirmative evidence to measure contradiction." *United*

---

**8.** The chaplain made conflicting statements regarding sincerity: "this statement seems to express sincerity;" "Captain Hager is quite sincere about his request for discharge;" "this applicant does not reflect sincerity."

*States v. Abbott,* 425 F.2d 910, 913 n. 4 (8th Cir.1970) (citations omitted). We now examine the investigating officer's report to determine if there is a basis in fact for the denial of conscientious objector status.

■ In his report following the hearing, Investigating Officer Pronchick expressly does "not question Captain Hager's sincerity...." He concludes, however, that Dr. Hager's beliefs "are neither firm nor fixed" and that his convictions "lack ... depth." Whether "depth of conviction" has any meaning independent of the requirement of sincerity is a question we must first decide.[9]

The two courts that have considered the issue have held, on somewhat different bases, that depth of conviction is not a separate test for a conscientious objector claim. In *Kurtz v. Laird,* 455 F.2d 965, 967 (5th Cir.1972), the Fifth Circuit understood depth of conviction to be equivalent to sincerity. The Eighth Circuit disagreed in *Kemp v. Bradley,* 457 F.2d 627 (8th Cir. 1972), finding "depth" a distinct but overly complex test in that it "requires theological or philosophical evaluation," *id.* at 629, and reiterating the Court's holding in *Witmer v. United States,* 348 U.S. at 381, 75 S.Ct. at 395, that the ultimate question is the applicant's " '*sincerity* ... in objecting, on religious grounds, to participation in war in any form.' " 457 F.2d at 629 (emphasis added in *Kemp*). *Kemp* concluded that "[e]ven beliefs which may seem shallow in a theological context, if sincerely held, can qualify a registrant as a conscientious objector." *Id.*

We agree, and add another reason to the Eighth Circuit's rationale for rejecting

depth of conviction as a separate test. The evaluation of a conscientious objector claimant's beliefs for sincerity is essentially a factual determination, both by the military in the first instance and the courts on review. The decisionmakers look for objective evidence in the record that would undermine the applicant's avowed belief in opposition on religious grounds to all war. When, however, the military undertakes to measure the depth with which the applicant holds that belief, we think the inquiry becomes an impermissible subjective look into his heart and soul. The question is, *does* he believe, not, *how deeply* does he believe. As we stated in *Bates,* where the hearing officer subjectively decided that Bates' beliefs were not religious, *"[w]hatever the stage of development* of petitioner's insight, it is of no consequence to this inquiry. It matters only that he *sincerely believes* that his convictions are religious in origin." 413 F.2d at 480 (emphasis added). *Cf. United States v. Seeger,* 380 U.S. at 185, 85 S.Ct. at 863 (sincerity is the crucial issue, "while the 'truth' of a belief is not open to question"). We will therefore examine the evidence cited by the investigating officer to see whether it provides a basis in fact to doubt Dr. Hager's sincerity.[10]

■ In Major Pronchick's opinion Dr. Hager's beliefs are "neither firm nor fixed," and he finds this "most evident" in Dr. Hager's statement that his beliefs matured during the application process. As we found in connection with the chaplain's similar reliance on this statement by Dr. Hager, this is no more than a suspicion based on timing.[11] That he doubted the

---

**9.** The Secretary argues in his brief that we have already considered the "depth" language contained in 32 C.F.R. § 75.5(a)(3) and AFR 35–24 ¶ 20(3) and did not question it, citing *Goldstein v. Middendorf,* 535 F.2d 1339, 1341 (1st Cir. 1976), and *Lobis v. Secretary of the United States Air Force,* 519 F.2d 304, 306 (1st Cir.1975). In fact, we did not specifically consider the language at issue but merely quoted the regulations; the issue in both cases was only sincerity. *See Goldstein* at 1341; *Lobis* at 306.

**10.** Because the ultimate question is sincerity, the investigating officer's admission that he "do[es] not question Captain Hager's sincerity"

might appear to end the inquiry, with the result that Dr. Hager has established his case for conscientious objector status. The specific doubts the investigating officer expresses, however, albeit in terms of lack of depth of beliefs, prompt us to look at the facts identified by the investigating officer "which would provide a basis for disbelieving" Dr. Hager. *Smith v. Laird,* 486 F.2d 307, 310 (10th Cir.1973).

**11.** Another reference to late crystallization is made by Major Pronchick in connection with Dr. Hager's asserted conflict between military duty and the Hippocratic Oath. He questions

"firm" and "fixed"[12] nature of the beliefs is another way of saying that the investigating officer doubted the beliefs were crystallized. *United States ex rel. Foster v. Schlesinger,* 520 F.2d 751, 755–56 (2d Cir.1975) ("fixed" beliefs are crystallized beliefs). To doubt that the beliefs are crystallized is to question their existence, i.e. the sincerity of Dr. Hager in making the claim.

■ Investigating Officer Pronchick also points to certain answers Dr. Hager gave at the hearing. He finds "troublesome" Dr. Hager's failure to remember having learned during Air Force training about his role as a noncombatant "as referenced in the law of armed conflict." Major Pronchick does not state what logical relevance this fact has to the issue of whether Dr. Hager is a sincere conscientious objector, and we perceive none. That Dr. Hager may have been unimpressed by this information during his training years before is not probative of his sincerity and is in fact completely consistent with his convictions against "participating *in any way* to the Air Force mission of the mass delivery of death and destruction." (Emphasis added).

Major Pronchick also finds "troublesome" Dr. Hager's answer to a hypothetical question, reporting as follows:

Q: You are armed, treating a patient in a war zone, in a properly marked medical facility, when the enemy bursts through the door. It is apparent you and your patient will be killed unless you shoot your attacker. Would you be able to shoot?

A: No.

Q: Why not?

A: I could not live with the consequences.

To this Investigating Officer this represents the lack of depth of his convictions. While Captain Hager maintains

that his beliefs occupy a similar importance to him as compared to a more traditional belief structure, it seems as if they are superficial, perhaps due to the recent onset of his convictions.

Mindful of our obligation to "indulge every fair and rational inference in favor of the reasons asserted by the hearing officer," *Goldstein,* 535 F.2d at 1344, we are at a loss to understand how Dr. Hager's answer fails to satisfy. According to Dr. Hager's beliefs, "one should not kill"; "Jesus taught that one should even turn the other cheek when confronted by violence." To Dr. Hager, "it is morally wrong … and against [his] conscience to take a human life." This ideal is universal for him; his beliefs do not comprehend "the concept of an enemy." "[T]he Hindu and Buddhist ideal of Karma" remind him "of the cause and effect nature of our existence," i.e. that "[his] actions have repercussions…."

Major Pronchick states that the answer to the hypothetical shows lack of depth but does not elaborate. We have already concluded that the proper focus is on the sincerity of Dr. Hager's beliefs, not their profundity. If Major Pronchick means to suggest that in his opinion one who genuinely holds the beliefs espoused by Dr. Hager would have answered in another manner, this would come perilously close to a subjective judgment by the investigating officer of what Dr. Hager's belief system requires, *see Clay v. United States,* 403 U.S. at 700, 91 S.Ct. at 2070, and might even tend to show that Major Pronchick illegitimately "reached his conclusion based on the assumption that his own views … were the correct ones." *Goldstein,* 535 F.2d at 1344.

The question posed by the investigating officer "confronted [Dr. Hager] with a 'Hobson's choice,'" *Daly v. Claytor,* 472

---

the depth of this belief in light of "how long ago Captain Hager took this oath." To accept this variant on the suspicious-timing reason for finding insincerity would be conclusively to presume that no in-service physicians who had previously taken the Hippocratic Oath would be eligible.

**12.** This language appears in the regulations at 32 C.F.R. § 75.3(a) ("*Conscientious Objection— General.* A firm, fixed and sincere objection to participation in war in any form or the bearing of arms, by reason of religious training and belief"), and AFR 35–25 ¶ 1a ("A firm, fixed, and sincere objection by reason of religious training and belief…").

F.Supp. 752, 755 n. 3 (D.Mass.1979) (quoting *Goldstein* at 1342): if he had stated that he would be willing to shoot the intruder, Major Pronchick might well have still concluded that his beliefs were superficial, as he had claimed to abhor all violence. A fair reading of his explanation of how serving in the military is incompatible with his conscience results in the conclusion that no other answer Dr. Hager might have given to the hypothetical posed could have been consistent with his conscientious objection to participation in war in any form.

■ The remainder of Major Pronchick's report describes Dr. Hager's demeanor and adverts to his having "submitted eight witness statements which attest to his sincerity." A claim of conscientious objection may be doubted on the basis of demeanor evidence, *Goldstein*, 535 F.2d at 1341, but here the investigating officer states that "Captain Hager's demeanor at the hearing was entirely appropriate." We have read the witness statements and find them to be powerful, unrebutted testimonials to the sincerity of Dr. Hager in his beliefs.

In *Lobis* we also had before us an Air Force Reserve physician who applied for a conscientious objector discharge shortly before his deferred active duty obligation was to commence—"one who, having reaped all the benefits of his service connection, [sought] to reject its burdens...." 519 F.2d at 307. We acknowledged that the timing might appear "suspicious" but held that "[s]omething more tangible than suspicion is needed to support a finding of insincerity." *Id.* (footnote omitted). The something-more-tangible we did not find. On a record that included questionable timing, an alleged lack of change in lifestyle, and a prior commitment to serve in the Air Force, we concluded that the Secretary had not provided a basis in fact for denying the conscientious objector claim. *Id.* at 309.

We are compelled to conclude the same here.

The only additional factor present in *Lobis* and missing in this case is the investigating officer's recommendation to the Secretary that the application be approved. *Id.* at 305. We do not find this to be a controlling distinction on this record. The investigating officer's recommendation in *Lobis* was based on his finding of sincerity. *Id.* at 307–308. Despite a contrary recommendation, and although Chaplain Robson's report is ambiguous on the point, Investigating Officer Pronchick also acknowledged Dr. Hager's sincerity. Lobis' investigating officer believed his conscientious objection claim. Dr. Hager's interviewers disbelieved his claim on the basis of reasons which, when fairly evaluated, reduce to the timing of the crystallization of Dr. Hager's conscientious objector beliefs. We cannot escape the conclusion that the key factor in rejecting Dr. Hager's claim because of its timing "was not his insincerity, but rather the apparent unfairness in discharging him from the Air Force after having invested substantial sums in his medical education in anticipation of utilizing his medical abilities in the Air Force Medical Corps." [13] *Smith v. Laird*, 486 F.2d at 313. This is not a sufficient basis in fact. *Id.; Lobis v. Secretary of the United States Air Force*, 519 F.2d at 307. *See also Ferrand v. Seamans*, 488 F.2d at 1391 ("careful reading" of record denying conscientious objector discharge to Air Force physician "persuades us that the conclusion that Ferrand lacked sincerity was at least in part motivated by the reluctance of the Air Force to lose an officer who had received the obvious benefits of the Berry Plan."); *Reinhold v. Schlesinger*, 379 F.Supp. 638, 642 (D.Mass.1974) ("The contention that Dr. Reinhold's acceptance of a commission under the Berry Plan in 1964 prevented his becoming an honest CO in 1969 is totally devoid of legal merit.").

**13.** Although not part of the record before the Secretary, we note in this regard that in the district court the Secretary submitted the affidavit of Major Alice Kottmyer attached to Respondent's Memorandum in Support of Motion to Consolidate Request For Injunctive Relief and Writ of Habeas Corpus. Major Kottmyer states that Dr. Hager is "crucial" to the orthopedic residency program at Lackland Air Force Base, the only such program in the Air Force, and that he is the only experienced physiatrist in the Air Force. With "a year of civilian practice," Major Kottmyer explains, "his experience is needed more than ever."

In his brief the Secretary purports to identify other evidence in the record to support the reasons cited for his decision. Pointing to Dr. Hager's asserted belief in "one Life Force" that requires preventing the suffering of all, the Secretary argues that this belief is inconsistent with Dr. Hager's refusal to treat his disabled military colleagues. We find this another impermissible attempt to judge Dr. Hager's personal creed by the Secretary's own subjective standard. *See Clay v. United States*, 403 U.S. at 700, 91 S.Ct. at 2070. Similarly we reject the Secretary's additional references to evidence in support of the late-crystallization reason for questioning Dr. Hager's sincerity, which merely reinforce suspicion but add nothing in the nature of "hard, reliable, provable facts," *Smith v. Laird*, 486 F.2d at 310, as a basis for disbelieving the conscientious objector claim.

The one new "fact" cited in the Secretary's brief to establish Dr. Hager's insincerity based on late crystallization is that his conscientious objection did not arise until shortly after he met and married a civilian "who, it appears was engaged in studies which would keep her in the Boston area." Were this a rational inference from the record we would accord it some significance, for it would constitute the type of concrete inconsistency casting doubt on the sincerity of the claim. *See Witmer v. United States*, 348 U.S. at 382–83, 75 S.Ct. at 396. The portion of Dr. Hager's application referenced by the Secretary, however, does not support its inference. There Dr. Hager states only that one year prior to the crystallization of his beliefs he met his future wife, who "was studying for a certificate in clinical psychology and working in the Rehabilitation Psychology Department at Boston University Hospital" where he was then working. To find, as does the Secretary, the implication from this statement alone that Dr. Hager wanted a discharge merely to be with his wife is to engage in utter conjecture.

**14.** In light of our decision we need not and do not reach petitioner's other argument that the

The underpinnings for its reasons having evaporated, the Secretary's decision cannot stand. We hold that on the record before us there appears no basis in fact to deny Dr. Hager's application for discharge based on conscientious objection.[14] The district court's decision denying the writ is, therefore, *Reversed.*

BREYER, Chief Judge, (concurring).

I am writing separately to underscore two key legal considerations that influence our result. First, we concede, as the Supreme Court has emphasized, that the military authorities, not the courts, are to make determinations of credibility. If Dr. Hager's "demeanor appeared shifty or evasive or ... his appearance was one of unreliability," the military might have found that he was insincere. *Witmer v. United States*, 348 U.S. 375, 382, 75 S.Ct. 392, 396, 99 L.Ed. 428 (1955). But, that is not what the military found here. Rather, Major Pronchick said that he did "not question Captain Hager's sincerity," and he said Dr. Hager's demeanor was "entirely appropriate." The Chaplain's report read as a whole makes clear that the Chaplain did not find that Dr. Hager was insincere in his statement of his beliefs, but, rather, thought that Dr. Hager's beliefs were not sufficiently "deep" or "profound." Thus, we cannot simply reject Dr. Hager's claim on the ground that the military found him insincere.

Second, the Supreme Court has also said that "when the uncontroverted evidence supporting" a conscientious objector "claim puts [the applicant] prima facie within the ... exemption, dismissal of the claim solely on the basis of suspicion and speculation" is not proper. *Dickinson v. United States*, 346 U.S. 389, 396–97, 74 S.Ct. 152, 157–58, 98 L.Ed. 132 (1953). Here, in addition to the many supporting affidavits and acknowledged factual history, Dr. Hager directly volunteered to pay back to the Air Force its monetary contribution to his education and to perform alternative civil service in place of his military obligation. Air Force improperly denied him access to the contents of his entire case file.

1463

And, he did so long before the recent conflict in Iraq could have made military duty seem particularly dangerous. The record does not explain how conscientious objector status could possibly work to his advantage were he not a sincere conscientious objector. Of course, he did not ask for that status prior to a call to active duty, but timing, while evidence of insincerity, in and of itself is not a *sufficient* basis for rejecting a conscientious objector claim. *See, e.g., Goldstein v. Middendorf,* 535 F.2d 1339 (1st Cir.1976); *Lobis v. Secretary,* 519 F.2d 304 (1st Cir.1975). I can find nothing else in the record that supports the military.

Given the demeanor-related findings of sincerity, and the factual basis in the record supporting Dr. Hager, there is nothing but "suspicion and speculation" to the contrary. We therefore must find in his favor.